UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ELLIOT & CALLAN, INC.,                          Case No. 07-CV-3391 (PJS/JJG)
a Minnesota corporation,

                    Plaintiff,                  FINDINGS OF FACT AND
                                                CONCLUSIONS OF LAW

v.

LUTHER ALLAN CROFTON,

                    Defendant.

---

Cass S. Weil, Kristin B. Heebner, Lorie A. Klein, and Mathew M. Meyer, MOSS
& BARNETT, PA, for plaintiff.

Chad A. Kelsch and James M. Jorissen, LEONARD, O'BRIEN, SPENCER,
GALE & SAYRE, LTD., for defendant.

Plaintiff Elliot & Callan, Inc. ("E&C") brings suit against defendant Luther Allan Crofton

under the Uniform Fraudulent Transfer Act ("UFTA"), Minn. Stat. § 513.41 et seq.  E&C's claim

was tried to the Court on July 15 and July 17, 2008.  Having heard the evidence and the

arguments of counsel, and having worked its way through the voluminous financial documents

introduced into evidence at trial, the Court makes the following findings of fact and conclusions

of law pursuant to Fed. R. Civ. P. 52(a).

## I.  FINDINGS OF FACT

### *A.  The Parties*

1.      E&C is a Minnesota corporation with its principal place of business in Plymouth, Minnesota.  Tr. 2-3.[1]  E&C operated a trucking company called Topaz Trucking ("Topaz"). Tr. 73.

2.      Crofton is an individual and a resident of the State of New Jersey.  At all relevant times, Crofton was the treasurer of and an 82% shareholder in Sandra Crofton Construction Company ("SCC"), a Minnesota corporation with its last known business address in Plymouth, Minnesota.  Tr. 3.  Crofton's brother, James Crofton, was the president of SCC.  Tr. 19.

3.      Crofton has a bachelor's degree in economics and a master's degree in finance. Tr. 16.  As treasurer of SCC, Crofton was responsible for the major financial functions of the company and had detailed knowledge of its financial condition.  Tr. 19, 101-02.  After SCC ran into financial trouble, Crofton personally did all of the company's bookkeeping and accounting. Tr. 102.

4.      Initially, Crofton's salary was supposed to be $40,000 per year.  Tr. 21.  To improve the company's cash flow, Crofton agreed to defer his salary until SCC was more profitable.  Tr. 105, 124.  SCC paid Crofton $17,541.54 in 2004 and $7,735.01 in 2005.  Tr. 4. Crofton received no salary from SCC in 2006 or 2007.  Tr. 22, 105-06.

---

[1] All citations to "Tr." are to the transcript of the trial.  All citations "P__" or "D__" are to the numbered trial exhibits, with "P" denoting "plaintiff" and "D" denoting "defendant."

*B. SCC's Acquisition and Operation of Topaz*

5.        In 2004, E&C and SCC entered into a purchase agreement in which SCC agreed to purchase the assets of Topaz for $1,327,535.  SCC financed part of the purchase price by granting E&C a promissory note in the amount of $631,535.  Tr. 3.

6.        After purchasing Topaz, SCC operated Topaz as a freight carrier and had about thirty trucks and trailers.  Tr. 83.  SCC sold some of the equipment it had purchased from E&C to Wallwork Financial Corporation ("Wallwork"), and Wallwork then leased the equipment back to SCC.  Tr. 4, 59, 115.  SCC had the option of taking title to the Wallwork equipment at the end of the leases.  Tr. 59.

7.        Not long after SCC purchased Topaz from E&C, a dispute developed between E&C and SCC.  E&C's owner, Randall deBruyn, also owned a company called DTS Transportation, which hired Topaz to ship freight for it.  Tr. 113.  For reasons that are not clear, DTS stopped paying for the shipments soon after SCC purchased Topaz.  Tr. 113.  In response, SCC stopped making payments on the promissory note to E&C, claiming that it had the right to offset the promissory-note payments against DTS's account balance.  Tr. 114.  After the parties' negotiations broke down, E&C served default notices on SCC, and in March 2005 SCC wrote off its DTS balance of around $130,000.  Tr. 113-14.

8.        In April 2005, deBruyn went to SCC's lot to repossess equipment that E&C had financed.  Tr. 73, 80.  E&C eventually repossessed all of the trucks it had financed.  Tr. 84.  DeBruyn also saw other people at SCC's lot attempting to repossess equipment.  Tr. 82.

9.      Aside from its financial difficulties, SCC was also having trouble with the United

States Department of Transportation ("DOT").  The DOT had conducted an audit of SCC's

operations in early 2005 and had identified a number of deficiencies.  Tr. 49-50.

10.      In May 2005, after concluding that operating as a freight carrier was not

financially feasible, SCC stopped carrying freight and switched to leasing its equipment to other

businesses.  Tr. 3-4, 50-51.

11.      In its earlier incarnation as a freight carrier, SCC set up an account against which

its drivers could draw advances to pay for fuel and other expenses.  The drivers charged expenses

to the account with SCC-provided credit cards, and SCC would later deduct those charges from

the compensation owed to the drivers.  Tr. 42-43.  The parties refer to this account and the

reimbursement system as "T-Chek."  Tr. 42.  If the amount due from a driver for a particular run

was greater than the amount of the driver's compensation for that run, SCC would carry forward

the remaining amount due on its balance sheet as an asset labeled "T-Chek Due from Drivers."

Tr. 46, 53; D11.

12.      When SCC converted from a freight carrier to a leasing company in May 2005,

the "T-Chek Due from Drivers" was $270,184.35.  Tr. 51; D11.  After SCC ceased operating as a

freight carrier (and thus no longer employed drivers), it was more difficult for SCC to collect the

"T-Chek Due from Drivers" because SCC could no longer deduct the amounts due from the

drivers' compensation.  Tr. 53-54, 56.

13.      SCC carried the $270,184.35 "T-Chek" asset on its balance sheets until

December 2005, when it wrote off the entire amount.  Tr. 51, 56; D11.  Before writing off this

asset, SCC had looked into the possibility of recovering the debt through lawsuits against the drivers or other means, but ultimately concluded that the debt was unrecoverable.  Tr. 51.

14.     In February 2006, E&C sued SCC and James Crofton on the 2004 promissory note in Minnesota state court.  SCC eventually stipulated to entry of judgment in the amount of $400,000.  Tr. 4.  On November 1, 2007, the court appointed a receiver to liquidate SCC's assets and apply them to the judgment.  Tr. 92-93.  Crofton's employment with SCC ended when the receiver was appointed.  Tr. 103.

### C.  Transfers Between SCC and Crofton

15.     Between July 1, 2004 and June 20, 2006, Crofton loaned approximately $474,182.01 of his own funds to SCC.  Tr. 3.  Around the same time (between June 3, 2004 and September 14, 2007), Crofton advanced approximately $156,456.69 of his own funds to SCC to cover company expenses.  Tr. 3.

16.     SCC partially repaid the loans it had received from Crofton in the total amount of $183,045.95.  Tr. 4.  SCC also partially reimbursed Crofton for the advances in the total amount of $151,312.67.  Tr. 4.  The parties refer to the total amount of loan repayments and advance reimbursements that SCC paid to Crofton as the "transfers."  E&C seeks to avoid those transfers in this action.

17.     As part of his duties as treasurer, Crofton prepared ledgers of loans, advances, repayments, and reimbursements that show the date and amount of each transaction.  These ledgers were admitted into evidence at trial.  *See* D12; D13.

### D.  SCC's Financial Condition

18.     SCC's accounting was done on an accrual basis.  Tr. 46.  Crofton prepared SCC's monthly balance sheets.  Tr. 47; D11.

19.     From June 2004 through November 2005, SCC's balance sheets reported that SCC's assets exceeded its liabilities each month, with the exception of two months: March 2005 and September 2005.  D11.  In those two months, SCC had negative equity of $1,062.30 (March) and $2,567.32 (September).

20.     Beginning in December 2005 and continuing through November 2007, SCC's balance sheets reported that SCC's liabilities exceeded its assets by well over $400,000 each month.  Tr. 57, 66; D11; P102.

21.     Generally speaking, SCC's balance sheets accurately portrayed the financial condition of the company.  Crofton was qualified to put them together, and the Court credits his testimony that they are accurate.  Tr. 58.

## II.  CONCLUSIONS OF LAW

### A.  E&C's Claim

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

2.     E&C's claim arises under Minn. Stat. § 513.45(b), which provides:

> A transfer made by a debtor is fraudulent as to a
> creditor whose claim arose before the transfer was
> made if the transfer was made to an insider for an
> antecedent debt, the debtor was insolvent at that
> time, and the insider had reasonable cause to believe
> that the debtor was insolvent.

3.       E&C has the burden of proving the elements of a fraudulent transfer under Minn. Stat. § 513.45(b).  E&C alleges that, for purposes of Minn. Stat. § 513.45(b), E&C was the "creditor," SCC was the "debtor," Crofton was the "insider," and the "transfers" were the loan repayments and advance reimbursements that SCC paid to Crofton.

4.       It is undisputed that E&C was a creditor of SCC as of June 2004, before any of the transfers to Crofton.  It is also undisputed that, during all relevant time periods, Crofton was an insider of SCC.  Finally, the parties have stipulated to the dates and amounts of transfers from SCC to Crofton.  The disputed elements of E&C's claim are therefore (a) whether SCC's transfers to Crofton were for "antecedent debt"; (b) whether SCC was insolvent at the time of the transfers; and (c) assuming SCC was insolvent at the time of the transfers, whether Crofton had reasonable cause to believe that SCC was insolvent.

### 1. Transfers for "Antecedent Debt"

5.       To avoid a transfer to Crofton under § 513.45(b), E&C must prove that the transfer was for "antecedent debt."  There is no dispute that the loans and advances that Crofton made to SCC created debt obligations on SCC's part.  But the parties dispute whether this debt was "antecedent" to the repayments and reimbursements that SCC made to Crofton — that is, to the transfers that E&C seeks to avoid in this litigation.

According to E&C, "antecedent debt" means simply debt that is incurred before the fraudulent transfer takes place.  But Crofton argues that "antecedent debt" has a different, more subtle meaning.  According to Crofton, the law distinguishes between an insider's payment of a corporation's "current" debt — that is, an insider's payment of the ongoing operating expenses of the corporation — and an insider's payment of the corporation's "antecedent" debt.  When an

insider pays a corporation's "current" debt, Crofton argues, the debt that the corporation then owes to the insider is "current" debt, rather than "antecedent" debt.  Crofton cites a number of cases in support of his argument.  *See Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 869 (Minn. 1981) (an insolvent corporation may properly reimburse officers for paying current corporate debts, but "payment . . . by an insolvent corporation to its officers and directors for antecedent debts to them is an invalid preference"); *D&K Healthcare Res., Inc. v. Supplee Enters. Inc.*, No. A04-1501, 2005 WL 1270527, at *3 (Minn. Ct. App. May 31, 2005) (same); *Travis v. Kurron Shares of Am., Inc.*, 272 F. Supp. 2d 816, 821 n.1 (D. Minn. 2003) (payments for current and ongoing services were not for "antecedent debt"); *Avnet, Inc. v. Beale*, No. 00-1789, 2001 WL 1640092, at *4 (D. Minn. June 9, 2001) (loans from insider to corporation to cover the corporation's ongoing operating expenses were current debts and therefore properly reimbursed).

But unlike the cases Crofton cites — all of which concern common-law claims for breach of fiduciary duty[2] — this case concerns the statutory remedy of § 513.45(b).  As both parties have recognized (whether explicitly or implicitly), § 513.45(b) is quite similar to the prohibition on preferential transfers in the Bankruptcy Code.  *See* 11 U.S.C. § 547.  Under § 547, the meaning of "antecedent debt" is straightforward:  A debt is "antecedent" if it is incurred before the transfer, period.  *See Velde v. Kirsch*, 543 F.3d 469, 472 (8th Cir. 2008) (noting that it was undisputed that a check was a preferential transfer because it paid a "preexisting obligation"); *In re Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996) ("A debt is antecedent if it is incurred

---

[2]Some of the cases also deal with statutory claims.  *See, e.g.*, *D&K Healthcare*, No. A04-1501, 2005 WL 1270527, at *3-4 (discussing fraudulent transfer claim under UFTA).  But the issue of "antecedent debt" did not arise in connection with the statutory claims, and the courts' discussion of "antecedent debt" is confined to the common-law claims.  *See, e.g.*, *id.*

*before* the transfer"); *In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (loan was

"antecedent" to grant of security interest where, although company executed a security agreement

on the same day as it received the loan, the security interest was not perfected until sixteen days

later); 5 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 547.03[4] (15th ed. rev. 2000).

Given the similarities between § 513.45(b) and § 547 of the Bankruptcy Code, the Court

concludes that the meaning of "antecedent debt" in § 513.45(b) likewise means nothing more

than debt that exists before the transfer.  Thus, it is not relevant whether or not SCC's *own* debts

— that is, the debts that Crofton's loans and advances were paying — were "current" or

"antecedent" at the time Crofton paid them.  The only relevant question is whether SCC owed an

existing debt to *Crofton* at the time that SCC made any particular transfer to Crofton.  With a

couple of minor exceptions, Crofton does not dispute that SCC repaid him for loans and

reimbursed him for advances only *after* Crofton made the loans and advances.  In general, then,

the transfers that SCC made to Crofton were indeed for "antecedent debt."

As to the exceptions: Crofton testified at trial that he occasionally received a transfer

from SCC that was more than the amount that SCC owed him at the time.  Pointing to

Exhibit D13, which is one of the ledgers of expenses advanced by Crofton and reimbursements

paid by SCC, Crofton testified that any time the ledger shows a negative balance, SCC had

transferred more money to him than it owed him.  Tr. 40.

E&C contends that Crofton's trial testimony was inconsistent with his deposition

testimony.  According to E&C, Crofton testified at his deposition that it was SCC's corporate

policy to reimburse for expenses only *after* the expense had been incurred.  The cited deposition

testimony does not support E&C's argument, however.  *See* Crofton Dep. 83, Mar. 3, 2008.

Crofton's testimony that he occasionally received amounts of money from SCC that were not payments for "antecedent debt" is thus undisputed.  Under § 513.45(b), then, those amounts are not voidable as fraudulent transfers.  Specifically, on those occasions when SCC transferred more to Crofton than it owed him, the portion of the transfer in excess of SCC's debt was not for "antecedent debt" and is therefore not voidable.[3]

## 2. Insolvency

6.      On the issue of whether SCC was insolvent at the time it made the transfers to Crofton, E&C first argues that SCC is presumed to have been insolvent during all relevant periods because it was not paying its debts as they came due.  *See* Minn. Stat. § 513.42(b) ("A debtor who is generally not paying debts as they become due is presumed to be insolvent.").  The Court finds otherwise.  SCC generally paid its debts more or less on time, with the exception of a few debts that were in dispute.  Tr. 121.  Even if SCC was not paying its debts as they came due, E&C has not established the time period during which SCC was failing to pay its debts.  As discussed below, the Court finds, based on SCC's financial records, that SCC was insolvent as of December 1, 2005.  Although E&C would like the Court to find that SCC was insolvent at a much earlier date, E&C's failure to establish any specific time period for SCC's failure to pay debts as they came due means that the Court cannot rely on the § 513.42(b) presumption to find insolvency on an earlier date.

7.      "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."  Minn. Stat. § 513.42(a).  Under § 513.42(a), SCC was

---

[3]Given the state of the record, calculating the total amount of the portions of various transfers that exceeded SCC's debt to Crofton is somewhat of a challenge, at least for a non-accountant.  The Court took a stab at it, and its calculations are discussed below.

solvent (with two minor exceptions) from June 2004 through November 2005, and was insolvent from December 2005 through November 2007.

### a. June 2004 through November 2005

SCC's balance sheets demonstrate that SCC's assets almost always exceeded its liabilities from June 2004 through November 2005.  E&C argues that the balance sheets do not accurately portray SCC's financial condition from April through November 2005 because, E&C argues, SCC improperly included the $270,184.35 "T-Chek" asset on its balance sheets during that period.  Excluding that asset, as E&C contends is proper, would render SCC insolvent for that period of time.

But E&C offered no expert or other testimony about the accounting standards that would apply to determine when the T-Chek asset should have been written off.  Instead, E&C offered only vague evidence that the debt became more difficult to collect after SCC ceased employing drivers.  The Court has no independent expertise in accounting, and thus, without expert testimony, the Court cannot find that the T-Chek asset should have been written off earlier solely on the basis of this vague evidence.  *Cf. In re Prime Realty, Inc.*, 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007) (in fraudulent-transfer action under the Bankruptcy Code, expert testimony is generally required to establish that the book value of an asset listed on a balance sheet is not the property's fair value for the purpose of proving insolvency).  The Court therefore finds that SCC was solvent for the period June 2004 through November 2005, with the exception of March and September 2005.

Although SCC's balance sheets show that it was insolvent during March and September 2005, its liabilities barely exceeded its assets in those months.  The difference was

only $1,062.30 in March 2005 and $2,567.32 in September 2005.  These amounts are so trivial that the Court cannot find, by a preponderance of the evidence, that any particular transfer to Crofton that took place during those two months occurred during a period of actual insolvency. For purposes of E&C's claim, therefore, the Court treats SCC as though it was solvent in March and September 2005 and excludes transfers during those months from the final calculation of net fraudulent transfers.

*b.   December 2005 through November 2007*

SCC's balance sheets demonstrate that SCC's liabilities exceeded its assets by large margins beginning in December 2005 and continuing through November 2007.  Although Crofton acknowledges that the numbers on the balance sheets are accurate, he claims that there are assets that were not included on the balance sheets.  Specifically, Crofton argues that SCC's option to take title to the equipment leased from Wallwork meant that, as SCC paid off the leases, equity was being created that was not reflected on the balance sheets.

But Crofton offered no expert testimony or other evidence that it would comport with generally accepted accounting principles to record this equity as an asset on SCC's balance sheets.  Assuming that recording such equity would be appropriate, Crofton did not explain why he failed to do so.  Crofton also did not dispute that if the equity were to be recorded, SCC would have to include a corresponding liability for the leases, which SCC did not do.  Tr. 126.  Most importantly, Crofton offered only vague testimony about the worth of the equity.  The Court does not have the accounting expertise to recalculate more than a year's worth of balance sheets on the basis of Crofton's vague testimony, and it appears highly unlikely that including the equity would have rendered SCC solvent at any time after December 1, 2005.

Crofton also testified that the liability for the promissory note should have been reduced by some unspecified amount to reflect the fact that E&C had repossessed equipment that was given in exchange for the note.  Tr. 119.  But even Crofton himself was unable to say what amount of the liability should have been removed.  The Court cannot find, on the basis of this extremely thin evidence, that SCC was solvent for the period during which its balance sheets showed that it was insolvent.  *Cf. In re Prime Realty, Inc.*, 380 B.R. at 535.

8.      As treasurer of SCC, Crofton had reasonable cause to believe that SCC was insolvent from December 1, 2005 through November 1, 2007.  The evidence at trial established that Crofton was intimately involved with all of the financial workings of SCC.  Although Crofton claimed that he would not have loaned or advanced money to the company if he thought it was insolvent, Crofton prepared SCC's balance sheets, which clearly showed that SCC was insolvent beginning in December 2005.  As discussed above, Crofton contends that certain assets could have been included and certain liabilities could have been reduced, but Crofton offered no explanation for his failure to account for these factors on SCC's balance sheets.  The Court therefore finds that Crofton had reasonable cause to believe that SCC was insolvent from December 1, 2005 through November 1, 2007.

3.  Conclusion

9.      E&C has established all of the elements of its claim under § 513.45(b).  SCC has been a creditor of SCC since June 2004, before SCC made any transfers to Crofton.  Crofton was an insider of SCC at all relevant times.  SCC made transfers to Crofton for "antecedent debt" during the period of SCC's insolvency (December 1, 2005 through November 1, 2007).  Finally, Crofton had reason to know that SCC was insolvent at the time of the transfers.

-13-

## B.  Crofton's "New Value" Defense

10.     Under Minn. Stat. § 513.48(f), a transfer is not voidable under § 513.45(b) "to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made . . . ."

11.     Crofton has the burden of proving this affirmative defense.

12.     Crofton contends that he provided two types of "new value" to SCC.  First, Crofton alleges that he provided services to SCC for which he was not adequately compensated. In his view, the difference between the value of the services that he provided and the amount that he was paid represented "new value" that he provided to SCC.  Second, Crofton alleges that the loans and advances that he made to SCC also represented "new value" that he provided to the company.  The Court agrees with Crofton about the loans and advances, but disagrees about the services.

13.     Crofton has failed to establish, by a preponderance of the evidence, that the services he provided to SCC represented "new value" to the company.

Crofton argues that $40,000 was not an adequate annual salary for his services and that, to the extent that the market value of his services exceeded his salary, he should be credited for "new value."  It is not at all clear that a corporate officer, having agreed to a certain salary, is entitled to argue that his services were worth more than his salary for purposes of the "new value" defense.  But even if Crofton can make this argument as a legal matter, Crofton's argument fails as a factual matter because he has not offered sufficient evidence of the "true" value of his services.

Crofton offered the testimony of Dr. Phillip B. Haber to establish that the salary range for the work Crofton performed would have been substantially more than $40,000 per year. But there are at least a couple of problems with Haber's testimony. First, the best evidence of the value of Crofton's services to the company is the amount that SCC agreed to pay and Crofton agreed to accept. The fact that Crofton may have been able to earn more at some other company has little relevance; SCC was a small start-up company, and Crofton was an owner of the company as well as an employee. Haber did not take these factors into account in determining the salary ranges. Haber also admitted that the ranges, which he obtained from a survey published by Robert Half International, are not broken out by industry. The Court therefore finds that Haber's opinions on the appropriate salary ranges are too speculative to support Crofton's argument that his services were worth more to the company than the salary he agreed to accept.

Of course, Crofton did not actually receive the $40,000 annual salary that he agreed to accept for his services. But Crofton clearly testified that his salary was merely deferred, not waived altogether. The value to SCC of deferring Crofton's compensation is not the amount of salary that was deferred, but instead the value to SCC of the improvement in its cash flow that resulted from the deferral. *See In re Buffalo Auto Glass*, 187 B.R. 451, 454 (Bankr. W.D.N.Y. 1995). In other words, the value to SCC of deferring, say, $40,000 owed to Crofton was not $40,000, but instead the value to SCC of not having to *pay* the $40,000 during the time the payment was deferred. Crofton offered no evidence of this value, and the Court therefore has no way of calculating the amount.

14.     Unlike Crofton's services, the loans and advances that Crofton made to SCC do constitute "new value" to SCC to the extent that Crofton made those loans and advances after receiving transfers from SCC.

The UFTA defines "value" as follows:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . .

Minn. Stat. § 513.43(a).  Thus, "value" includes "property," which would obviously include the money that Crofton loaned or advanced to SCC.  Similarly, under the section of the Bankruptcy Code on preferential transfers, "new value" includes "money or money's worth in goods, services, or new credit . . . ."  11 U.S.C. § 547(a)(2).  The Court therefore concludes that, to the extent that Crofton made loans or advances to SCC after receiving transfers from SCC, those loans or advances are "new value" that can offset previous transfers.  The loans and advances cannot, however, offset *later* transfers, as § 513.48(f) expressly requires that the "new value" be given "*after* the transfer was made."

15.     The "new value" provided by Crofton in the form of loans or advances need not have remained unpaid in order to offset previous transfers.  E&C has not argued to the contrary, but the Court nonetheless highlights the point in order to make clear why it is not necessary to determine whether Crofton later received repayment or reimbursement for any "new value."

Several courts have suggested that, under the Bankruptcy Code, the "new value" defense does not require that the "new value" remain unpaid.  *Cf. In re IRFM, Inc.*, 52 F.3d 228, 231-32 (9th Cir. 1995) (discussing various approaches to determining whether "new value" for which the

-16-

debtor later pays can offset prior preferential transfers under 11 U.S.C. § 547); *In re Jones Truck Lines*, 130 F.3d 323, 329 (8th Cir. 1997) (holding that, under 11 U.S.C. § 547(c)(4), a later payment in exchange for "new value" only deprives the defendant of the "new value" defense if the later payment is an otherwise unavoidable transfer); *In re Chez Foley, Inc.*, 211 B.R. 25, 27-29 (Bankr. D. Minn. 1997) (same). Although the "new value" defense under UFTA is not identical to the "new value" defense under the Bankruptcy Code, the language of UFTA similarly does not require that the "new value" remain unpaid. Instead, the only requirement under UFTA is that the "new value" not be "secured by a valid lien." Minn. Stat. § 513.48(f)(1). E&C has never argued that any of the loans or advances that Crofton made were secured by valid liens. The Court therefore concludes that Crofton is entitled to set-offs for any "new value" in the form of loans or advances, whether or not SCC later repaid or reimbursed Crofton for that "new value."

16. Crofton's loans and advances to SCC are adequately documented in the ledgers that Crofton kept.

E&C argues that Crofton has failed to prove that some of the alleged loans and advances were actually made to SCC. For some of the loans and advances, E&C argues, Crofton has provided what the parties call "backup" — that is, documentation that the loans and advances were actually given to SCC to cover various costs and expenses. As to those loans and advances, E&C concedes that they constitute "new value." But, E&C argues, some of the loans and advances lack any "backup," and the only proof of those loans and advances is their appearance in the ledgers that Crofton kept. *See* D12, D13. As a result, E&C argues, Crofton has failed to

meet his burden of proof as to the loans and advances lacking "backup," and those loans and advances should not be used to offset any prior transfers.

The Court disagrees.  Crofton need only prove the existence of a loan or advance by a preponderance of the evidence — not by clear and convincing evidence or beyond a reasonable doubt.  The ledgers themselves (which Crofton kept in the ordinary course of business), as well as Crofton's testimony that the ledgers are accurate (which testimony the Court credits), provide sufficient evidence that Crofton made the loans and advances reflected in the ledgers.

The Court also notes that, in its trial brief, E&C did not contest the validity of any of Crofton's loans and advances, but stated only that E&C was disputing Crofton's attempt to characterize his *services* as "new value."  Thus, Crofton had no warning that the accuracy of his ledgers would be challenged at trial, and thus no reason to be prepared to submit proof beyond the ledgers and his testimony that the ledgers were accurate.  All of the evidence received at trial suggests that Crofton tried to be accurate in keeping SCC's financial records, and there is nothing suspicious about any of the entries in the ledgers.  In fact, the nature and amount of the expenses for which Crofton was reimbursed demonstrate that Crofton was actually quite frugal.  Crofton has met his burden of proving, by a preponderance of the evidence, that he made the loans and advances that appear in the ledgers.

The Court therefore concludes that, under § 513.48(f), all of Crofton's loans and advances to SCC are "new value."  As a result, a loan or advance from Crofton to SCC may be used to offset a *previous* transfer from SCC to Crofton.  Again, though, no loan or advance may offset a *later* transfer from SCC to Crofton.  Put differently, Crofton's loans and advances — his

"new value" — cannot be carried forward, but can only be used to offset a fraudulent transfer

that SCC had made to Crofton prior to the time that Crofton gave the "new value."

### C. The Judgment

17.    A creditor may maintain an action under § 513.45(b) to avoid fraudulent transfers

up to an amount necessary to satisfy the creditor's claim.  Minn. Stat. §§ 513.47(a)(1), 513.48(b).

18.    There is no dispute that E&C's claim exceeds the amount of any voidable

transfers.  E&C is therefore entitled to recover a judgment against Crofton for transfers that

(a) occurred during the period of SCC's insolvency; (b) were for "antecedent debt"; and (c) are

not set off by later "new value."

19.    The Court used Crofton's ledgers (D12 and D13) to create a spreadsheet of SCC's

transfers to Crofton and the "new value" that Crofton provided to SCC.  The spreadsheet begins

on December 1, 2005, the date that SCC became insolvent.[4]  The ledgers are complete through

August 2007, but the Court included in its spreadsheet several post-August 2007 transfers to

Crofton, which do not appear in the ledgers, but which Crofton admitted receiving and which are

documented by copies of checks.  Tr. 25-30; P105.  (Crofton also testified vaguely about post-

August 2007 loans and advances that might represent additional "new value" and thus might

offset the post-August 2007 transfers, but failed to offer sufficient proof of the existence and

---

[4]At the end of trial, E&C submitted a demonstrative exhibit of fraudulent transfers and
"new value."  The Court used this exhibit as a guide to determining the nature of the transactions
in D12 and D13.  There are one or two minor entries in D12 and D13 that could be fraudulent
transfers but that were not listed in E&C's demonstrative exhibit.  As E&C did not include those
entries in its demonstrative exhibit, the Court concludes that those entries were not in fact
transfers to Crofton.

amount of these loans and advances.)  The Court's spreadsheet is attached as Appendix A to the Court's findings of fact and conclusions of law.

20.     As reflected in the ledgers, SCC was in debt to Crofton on December 1, 2005, the date that SCC became insolvent.  The spreadsheet thus begins with the first transfer from SCC to Crofton that took place during the period of SCC's insolvency.  Because SCC was in debt to Crofton on that date, the transfer was for "antecedent debt" and is therefore fraudulent.

21.     The column entitled "Net Fraudulent Transfers" is a running tally of the individual fraudulent transfers to Crofton (shown in the column "Fraud. Transfer") minus the "new value" that Crofton gave to SCC (shown in the column "New Value").  In keeping with the legal principle that "new value" may not be carried forward to offset later transfers, the Court wrote off the amount of "new value" that exceeded the net fraudulent transfers as of the date the "new value" was given.  For example, on January 13, 2006, Crofton gave $280 of "new value."  But, at the time, the net amount of the fraudulent transfers from SCC to Crofton was $255.02.  Thus, the $280 of "new value" essentially "re-set" the net amount of fraudulent transfers to $0.  The excess "new value" — that is, the difference between $280 and $255.02 — was written off.

22.     As noted, SCC was in debt to Crofton as of December 1, 2005, the date SCC became insolvent.  For the most part, SCC remained in debt to Crofton during the entire period of its insolvency.  There were a few times during this period, however, when SCC's transfers to Crofton actually exceeded the amount that SCC owed Crofton at the time.  On those rare occasions, the excess amount of SCC's transfer — that is, SCC's overpayment — is not voidable under § 513.45(b) because the overpayment was not for "antecedent debt."

-20-

23.     To exclude SCC's overpayments from the net amount of fraudulent transfers, the Court located the first instance of an overpayment by SCC to Crofton as evidenced by a negative amount in the "Balance" column in D13.  According to D13, the first instance of an overpayment by SCC to Crofton was on January 2, 2007.  On that date, SCC made a transfer of $339.12 to Crofton.  But, as shown in D13, that transfer exceeded the amount of SCC's debt to Crofton by $5.89.  The $5.89 overpayment cannot be included in the total amount of fraudulent transfers because it was not payment for an "antecedent debt."  The Court therefore deleted $5.89 (the overpayment) from $339.12 (the total amount of the transfer), with the result — $333.23 (the amount of the transfer that was for antecedent debt) — appearing in the "Fraudulent Transfer" column.

24.     The Court then repeated the process through the end of D13.  For example, the second instance of an overpayment by SCC to Crofton, as evidenced by a negative amount in the "Balance" column in D13, was on February 21, 2007.  On that date, SCC made a transfer of $650 to Crofton.  But that transfer exceeded the amount of SCC's debt to Crofton by $489.56, and thus the amount of the February 21, 2007 transfer that was fraudulent was only $160.44.[5]

25.     As shown on the Court's spreadsheet, the Court calculates that the net amount of transfers that (a) occurred during the period of SCC's insolvency, (b) were for "antecedent debt," and (c) are not set off by later "new value" is $47,427.60.  Judgment will be entered in favor of E&C and against Crofton in that amount.

---

[5]According to the "Balance" column in D13, the overpayment was $495.45.  But this amount includes the earlier $5.89 overpayment.  To avoid double-counting the earlier $5.89 overpayment, the Court deleted it from the $495.45 figure to yield a net overpayment of $489.56. The Court similarly corrected later overpayment figures to avoid double-counting.

26.     As the Court has noted, it does not have any independent expertise in accounting, and, although the Court has done its best, it is possible that the Court has made mathematical errors or errors in methodology.  The Court reminds the parties that, under Fed. R. Civ. P. 59(a)(2), the Court may, on motion for a new trial, open the judgment, amend findings of fact, and direct the entry of a new judgment.  If a party identifies a mathematical or similar error, that party may bring a timely motion under Fed. R. Civ. P. 59 and ask the Court to correct the error and enter a new judgment.  And, of course, a party may bring whatever other post-judgment motions it deems appropriate, subject to the deadlines and other requirements of the Federal Rules of Civil Procedure.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that plaintiff Elliot & Callan, Inc. shall recover $47,427.60 from defendant Luther Allan Crofton.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 30, 2009                          s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge

| Date | Transfer | Overpayment | Fraud. Transfer | New Value | Net Fraudulent Transfers |
|---|---|---|---|---|---|
| Elliott & Callan, Inc. v. Crofton, No. 07-CV-3391 (PJS/JJG) Appendix A | | | | | |
| 12/6/2005 | $ 114.33 | | $ 114.33 | | $ 114.33 |
| 12/7/2005 | $ 181.81 | | $ 181.81 | $ 21.17 | $ 274.97 |
| 12/22/2005 | | | $ - | $ 19.95 | $ 255.02 |
| 1/13/2006 | | | $ - | $ 280.00 | $ - |
| 1/17/2006 | $ 17,605.38 | | $ 17,605.38 | $ 19.95 | $ 17,585.43 |
| 1/24/2006 | | | $ - | $ 7,976.07 | $ 9,609.36 |
| 2/7/2006 | | | $ - | $ 0.24 | $ 9,609.12 |
| 2/14/2006 | | | $ - | $ 0.24 | $ 9,608.88 |
| 2/15/2006 | | | $ - | $ 0.63 | $ 9,608.25 |
| 2/17/2006 | | | $ - | $ 19.95 | $ 9,588.30 |
| 2/21/2006 | $ 158.00 | | $ 158.00 | | $ 9,746.30 |
| 2/22/2006 | | | $ - | $ 639.50 | $ 9,106.80 |
| 2/25/2006 | $ 46.61 | | $ 46.61 | | $ 9,153.41 |
| 2/25/2006 | $ 70.41 | | $ 70.41 | $ 0.63 | $ 9,223.19 |
| 2/28/2006 | $ 639.50 | | $ 639.50 | | $ 9,862.69 |
| 2/28/2006 | $ 25.43 | | $ 25.43 | | $ 9,888.12 |
| 3/1/2006 | $ 2.33 | | $ 2.33 | | $ 9,890.45 |
| 3/1/2006 | $ 33.89 | | $ 33.89 | | $ 9,924.34 |
| 3/1/2006 | $ 65.25 | | $ 65.25 | | $ 9,989.59 |
| 3/2/2006 | $ 54.70 | | $ 54.70 | | $ 10,044.29 |
| 3/2/2006 | $ 7.86 | | $ 7.86 | | $ 10,052.15 |
| 3/11/2006 | | | $ - | $ 23.19 | $ 10,028.96 |
| 3/15/2006 | | | $ - | $ 0.24 | $ 10,028.72 |
| 4/3/2006 | | | $ - | $ 0.63 | $ 10,028.09 |
| 4/14/2006 | | | $ - | $ 0.87 | $ 10,027.22 |
| 5/6/2006 | | | $ - | $ 1.06 | $ 10,026.16 |
| 5/9/2006 | | | $ - | $ 0.24 | $ 10,025.92 |
| 5/25/2006 | $ 701.00 | | $ 701.00 | | $ 10,726.92 |
| 6/2/2006 | $ 3,000.00 | | $ 3,000.00 | | $ 13,726.92 |
| 6/13/2006 | $ 1,000.00 | | $ 1,000.00 | | $ 14,726.92 |
| 6/15/2006 | | | $ - | $ 1.11 | $ 14,725.81 |
| 6/19/2006 | | | $ - | $ 9.99 | $ 14,715.82 |
| 6/26/2006 | $ 3,000.00 | | $ 3,000.00 | | $ 17,715.82 |
| 6/30/2006 | $ 1,000.00 | | $ 1,000.00 | | $ 18,715.82 |
| 7/7/2006 | | | $ - | $ 6.35 | $ 18,709.47 |
| 7/29/2006 | $ 2,000.00 | | $ 2,000.00 | | $ 20,709.47 |
| 9/19/2006 | | | $ - | $ 1.50 | $ 20,707.97 |
| 11/1/2006 | $ 200.00 | | $ 200.00 | | $ 20,907.97 |
| 11/5/2006 | | | $ - | $ 14.97 | $ 20,893.00 |
| 11/6/2006 | $ 143.55 | | $ 143.55 | | $ 21,036.55 |
| 11/6/2006 | $ 42.59 | | $ 42.59 | $ 37.26 | $ 21,041.88 |
| 11/6/2006 | $ 26.93 | | $ 26.93 | $ 138.45 | $ 20,930.36 |
| 11/18/2006 | $ 36.38 | | $ 36.38 | | $ 20,966.74 |
| 11/18/2006 | $ 11.20 | | $ 11.20 | $ 11.20 | $ 20,966.74 |
| 12/1/2006 | $ 6.98 | | $ 6.98 | | $ 20,973.72 |
| 12/5/2006 | $ 14.86 | | $ 14.86 | | $ 20,988.58 |
| 12/6/2006 | $ 70.13 | | $ 70.13 | | $ 21,058.71 |
| 12/6/2006 | $ 19.84 | | $ 19.84 | | $ 21,078.55 |
| 12/6/2006 | | | $ - | $ 5.81 | $ 21,072.74 |

| Date | Transfer | Overpayment | Fraud. Transfer | New Value | Net Fraudulent Transfers |
|------|---------|-------------|-----------------|-----------|--------------------------|
| 12/7/2006 | | | $          - | $    160.00 | $        20,912.74 |
| 12/11/2006 | | | $          - | $    300.00 | $        20,612.74 |
| 12/15/2006 | | | $          - | $      23.00 | $        20,589.74 |
| 12/28/2006 | $    529.00 | | $    529.00 | | $        21,118.74 |
| 1/1/2007 | $     18.51 | | $      18.51 | | $        21,137.25 |
| 1/1/2007 | $     21.28 | | $      21.28 | $      18.51 | $        21,140.02 |
| 1/1/2007 | $     18.47 | | $      18.47 | $      21.28 | $        21,137.21 |
| 1/1/2007 | $       7.39 | | $        7.39 | $      18.49 | $        21,126.11 |
| 1/1/2007 | $       5.97 | | $        5.97 | $        7.40 | $        21,124.68 |
| 1/2/2007 | $    339.12 | $      5.89 | $    333.23 | | $        21,457.91 |
| 1/9/2007 | | | $          - | $        5.00 | $        21,452.91 |
| 1/9/2007 | | | $          - | $    607.60 | $        20,845.31 |
| 1/11/2007 | | | $          - | $      12.09 | $        20,833.22 |
| 1/12/2007 | | | $          - | $    139.29 | $        20,693.93 |
| 1/12/2007 | | | $          - | $        8.50 | $        20,685.43 |
| 1/12/2007 | | | $          - | $        4.57 | $        20,680.86 |
| 1/12/2007 | | | $          - | $        5.01 | $        20,675.85 |
| 1/12/2007 | | | $          - | $      66.00 | $        20,609.85 |
| 1/12/2007 | | | $          - | $        3.19 | $        20,606.66 |
| 1/12/2007 | | | $          - | $      10.00 | $        20,596.66 |
| 1/12/2007 | | | $          - | $      10.00 | $        20,586.66 |
| 1/19/2007 | $    859.05 | | $    859.05 | | $        21,445.71 |
| 1/21/2007 | $     97.81 | | $      97.81 | $      97.81 | $        21,445.71 |
| 1/24/2007 | | | $          - | $ 1,599.00 | $        19,846.71 |
| 1/28/2007 | | | $          - | $      31.54 | $        19,815.17 |
| 2/1/2007 | | | $          - | $        2.49 | $        19,812.68 |
| 2/4/2007 | $ 1,650.59 | | $ 1,650.59 | | $        21,463.27 |
| 2/7/2007 | | | $          - | $      57.51 | $        21,405.76 |
| 2/12/2007 | | | $          - | $      57.54 | $        21,348.22 |
| 2/13/2007 | | | $          - | $      15.00 | $        21,333.22 |
| 2/17/2007 | | | $          - | $        7.80 | $        21,325.42 |
| 2/19/2007 | | | $          - | $      19.95 | $        21,305.47 |
| 2/21/2007 | $    650.00 | $    489.56 | $    160.44 | | $        21,465.91 |
| 2/27/2007 | | | $          - | $        1.35 | $        21,464.56 |
| 3/3/2007 | | | $          - | $      15.00 | $        21,449.56 |
| 3/7/2007 | | | $          - | $    105.00 | $        21,344.56 |
| 3/8/2007 | | | $          - | $    150.00 | $        21,194.56 |
| 3/9/2007 | | | $          - | $    903.37 | $        20,291.19 |
| 3/13/2007 | | | $          - | $      10.20 | $        20,280.99 |
| 3/13/2007 | | | $          - | $      25.00 | $        20,255.99 |
| 3/13/2007 | | | $          - | $        3.75 | $        20,252.24 |
| 3/15/2007 | | | $          - | $ 25,000.00 | $                - |
| 3/16/2007 | | | $          - | $      15.00 | $                - |
| 3/17/2007 | | | $          - | $      49.95 | $                - |
| 3/19/2007 | | | $          - | $      19.95 | $                - |
| 3/20/2007 | $    800.00 | | $    800.00 | $        3.99 | $            796.01 |
| 3/24/2007 | | | $          - | $      10.59 | $            785.42 |
| 3/27/2007 | | | $          - | $ 18,672.82 | $                - |
| 3/27/2007 | | | $          - | $      14.40 | $                - |
| 3/29/2007 | $ 4,250.00 | | $ 4,250.00 | | $          4,250.00 |
| 3/31/2007 | | | $          - | $    683.03 | $          3,566.97 |
| 4/1/2007 | $ 8,000.00 | | $ 8,000.00 | | $        11,566.97 |

| Date | Transfer | Overpayment | Fraud. Transfer | New Value | Net Fraudulent Transfers |
|------|----------|-------------|-----------------|-----------|--------------------------|
| 4/2/2007 | | | $          - | $      14.40 | $      11,552.57 |
| 4/9/2007 | | | $          - | $      29.04 | $      11,523.53 |
| 4/13/2007 | | | $          - | $      15.00 | $      11,508.53 |
| 4/15/2007 | | | $          - | $ 16,750.00 | $                - |
| 4/15/2007 | | | $          - | $      15.89 | $                - |
| 4/16/2007 | | | $          - | $      91.86 | $                - |
| 4/19/2007 | $ 18,800.00 | | $   18,800.00 | $      19.95 | $      18,780.05 |
| 4/21/2007 | | | $          - | $      11.76 | $      18,768.29 |
| 4/21/2007 | | | $          - | $      10.20 | $      18,758.09 |
| 4/24/2007 | $ 16,850.00 | | $   16,850.00 | | $      35,608.09 |
| 4/27/2007 | $ 12,750.00 | | $   12,750.00 | | $      48,358.09 |
| 4/30/2007 | | | $          - | $       5.00 | $      48,353.09 |
| 5/3/2007 | | | $          - | $     139.12 | $      48,213.97 |
| 5/3/2007 | | | $          - | $      39.39 | $      48,174.58 |
| 5/3/2007 | | | $          - | $   1,398.80 | $      46,775.78 |
| 5/3/2007 | | | $          - | $      15.00 | $      46,760.78 |
| 5/4/2007 | | | $          - | $       8.00 | $      46,752.78 |
| 5/4/2007 | | | $          - | $       3.19 | $      46,749.59 |
| 5/4/2007 | | | $          - | $      11.00 | $      46,738.59 |
| 5/4/2007 | | | $          - | $       5.00 | $      46,733.59 |
| 5/5/2007 | | | $          - | $      34.00 | $      46,699.59 |
| 5/6/2007 | | | $          - | $   1,500.00 | $      45,199.59 |
| 5/7/2007 | $   2,500.00 | | $    2,500.00 | | $      47,699.59 |
| 5/9/2007 | | | $          - | $      15.00 | $      47,684.59 |
| 5/15/2007 | | | $          - | $      10.95 | $      47,673.64 |
| 5/15/2007 | | | $          - | $      24.83 | $      47,648.81 |
| 5/18/2007 | $     450.00 | | $      450.00 | | $      48,098.81 |
| 5/19/2007 | | | $          - | $       9.99 | $      48,088.82 |
| 5/19/2007 | | | $          - | $      19.95 | $      48,068.87 |
| 5/21/2007 | | | $          - | $     419.35 | $      47,649.52 |
| 5/23/2007 | $   8,500.00 | $   6,644.93 | $    1,855.07 | $ 13,444.65 | $      36,059.94 |
| 5/23/2007 | | | $          - | $       2.65 | $      36,057.29 |
| 5/28/2007 | | | $          - | $      15.00 | $      36,042.29 |
| 5/31/2007 | | | $          - | $     264.12 | $      35,778.17 |
| 6/1/2007 | | | $          - | $       4.99 | $      35,773.18 |
| 6/6/2007 | | | $          - | $     150.00 | $      35,623.18 |
| 6/6/2007 | | | $          - | $       0.82 | $      35,622.36 |
| 6/6/2007 | | | $          - | $      20.43 | $      35,601.93 |
| 6/8/2007 | $   1,000.00 | | $    1,000.00 | $      20.43 | $      36,581.50 |
| 6/8/2007 | $     526.71 | | $      526.71 | | $      37,108.21 |
| 6/14/2007 | $   2,000.00 | | $    2,000.00 | | $      39,108.21 |
| 6/17/2007 | | | $          - | $      30.01 | $      39,078.20 |
| 6/18/2007 | $   2,000.00 | | $    2,000.00 | | $      41,078.20 |
| 6/19/2007 | | | $          - | $      19.95 | $      41,058.25 |
| 6/20/2007 | | | $          - | $      25.00 | $      41,033.25 |
| 6/21/2007 | | | $          - | $      63.64 | $      40,969.61 |
| 6/21/2007 | | | $          - | $      46.25 | $      40,923.36 |
| 6/21/2007 | | | $          - | $       3.19 | $      40,920.17 |
| 6/21/2007 | | | $          - | $      11.00 | $      40,909.17 |
| 6/21/2007 | | | $          - | $       6.25 | $      40,902.92 |
| 6/21/2007 | | | $          - | $      10.00 | $      40,892.92 |
| 6/21/2007 | | | $          - | $      35.00 | $      40,857.92 |

| Date | Transfer | Overpayment | Fraud. Transfer | New Value | Net Fraudulent Transfers |
|---|---|---|---|---|---|
| 6/21/2007 | | | $ - | $ 34.00 | $ 40,823.92 |
| 6/23/2007 | $ 600.00 | | $ 600.00 | $ 500.00 | $ 40,923.92 |
| 6/26/2007 | | | $ - | $ 8.95 | $ 40,914.97 |
| 6/30/2007 | $ 428.90 | | $ 428.90 | | $ 41,343.87 |
| 7/5/2007 | | | $ - | $ 31.00 | $ 41,312.87 |
| 7/8/2007 | | | $ - | $ 15.54 | $ 41,297.33 |
| 7/9/2007 | | | $ - | $ 22.61 | $ 41,274.72 |
| 7/14/2007 | | | $ - | $ 33.19 | $ 41,241.53 |
| 7/16/2007 | $ 1,000.00 | | $ 1,000.00 | $ 16.86 | $ 42,224.67 |
| 7/18/2007 | | | $ - | $ 19.95 | $ 42,204.72 |
| 7/19/2007 | $ 139.15 | | $ 139.15 | | $ 42,343.87 |
| 7/20/2007 | | | $ - | $ 8.20 | $ 42,335.67 |
| 7/22/2007 | | | $ - | $ 14.85 | $ 42,320.82 |
| 7/23/2007 | $ 2,000.00 | | $ 2,000.00 | | $ 44,320.82 |
| 7/24/2007 | | | $ - | $ 3.00 | $ 44,317.82 |
| 7/25/2007 | | | $ - | $ 20.00 | $ 44,297.82 |
| 7/25/2007 | $ 8,453.81 | $ 3,267.38 | $ 5,186.43 | | $ 49,484.25 |
| 7/25/2007 | $ 993.46 | $ 993.46 | $ - | | $ 49,484.25 |
| 7/26/2007 | | | $ - | $ 696.80 | $ 48,787.45 |
| 7/26/2007 | | | $ - | $ 6.41 | $ 48,781.04 |
| 7/27/2007 | | | $ - | $ 10.52 | $ 48,770.52 |
| 7/27/2007 | | | $ - | $ 11.00 | $ 48,759.52 |
| 7/27/2007 | | | $ - | $ 4.60 | $ 48,754.92 |
| 7/27/2007 | | | $ - | $ 1,000.00 | $ 47,754.92 |
| 7/27/2007 | | | $ - | $ 8,453.81 | $ 39,301.11 |
| 7/28/2007 | | | $ - | $ 349.85 | $ 38,951.26 |
| 7/29/2007 | | | $ - | $ 28.21 | $ 38,923.05 |
| 7/29/2007 | | | $ - | $ 2.54 | $ 38,920.51 |
| 7/29/2007 | | | $ - | $ 2.44 | $ 38,918.07 |
| 7/30/2007 | | | $ - | $ 104.88 | $ 38,813.19 |
| 7/30/2007 | | | $ - | $ 111.00 | $ 38,702.19 |
| 7/30/2007 | | | $ - | $ 11.00 | $ 38,691.19 |
| 7/30/2007 | | | $ - | $ 30.40 | $ 38,660.79 |
| 7/30/2007 | | | $ - | $ 327.78 | $ 38,333.01 |
| 8/2/2007 | | | $ - | $ 5,000.00 | $ 33,333.01 |
| 8/3/2007 | | | $ - | $ 16.25 | $ 33,316.76 |
| 8/4/2007 | | | $ - | $ 8.20 | $ 33,308.56 |
| 8/6/2007 | | | $ - | $ 20.00 | $ 33,288.56 |
| 8/10/2007 | | | $ - | $ 50.00 | $ 33,238.56 |
| 8/10/2007 | | | $ - | $ 50.00 | $ 33,188.56 |
| 8/15/2007 | | | $ - | $ 5.25 | $ 33,183.31 |
| 8/20/2007 | | | $ - | $ 19.95 | $ 33,163.36 |
| 8/28/2007 | | | $ - | $ 23.26 | $ 33,140.10 |
| 8/28/2007 | | | $ - | $ 16.25 | $ 33,123.85 |
| 8/28/2007 | | | $ - | $ 150.00 | $ 32,973.85 |
| 9/18/2007 | $ 5,000.00 | | $ 5,000.00 | | $ 37,973.85 |
| 9/19/2007 | $ 5,000.00 | | $ 5,000.00 | | $ 42,973.85 |
| 9/25/2007 | $ 135.00 | | $ 135.00 | | $ 43,108.85 |
| 10/5/2007 | $ 2,200.00 | | $ 2,200.00 | | $ 45,308.85 |
| 10/10/2007 | $ 2,118.75 | | $ 2,118.75 | | $ 47,427.60 |